Good morning, Your Honors. David Koch for Ben Leanne Hoskins, Dream Financial and Oxford Financial. I would request to reserve four minutes for rebuttal. Your Honors, the undisputed facts in this case demonstrated that Ben Hoskins had no participation and or control of the sales practices and return policies that were at issue in the case. What do we mean by the fact that he got copied on the e-mails and in essence given a chance to comment on the sales scripts? The sales scripts themselves, the FTC concedes that there was no, the claim is not about the scripts themselves. Instead they said telemarketers were encouraged or told to go off the script and make, they weren't chastised for making promises that were not a part of the scripts. But he was also involved in dealing with the volume of complaints that the consumers were making to the point where at least the Utah Attorney General apparently had some concern about what the company was doing and the credit card companies were threatening to what takes some sort of I guess financial punitive action against them. Two responses on that. The Utah Attorney General was not investigating. There was an infomercial that he had a contact in the Utah Attorney General's office. He said, here's an infomercial, are there any concerns about this? There was no investigation that ever took place by the Utah Attorney General. Well, I mean, did he just drop by to see an old friend in the Utah Attorney General's office so that they could sit around and talk about the infomercial? Essentially, there's an infomercial. An infomercial is not part of... Why would you have that conversation if you weren't worried about consumer complaints? Well, the infomercial itself is not part of this case. It was the sales practices, the conversations, the phone conversations. Well, he started out by saying that he had no involvement, but the evidence suggests to the contrary that he was heavily involved in the... In the operation of this business. He signed checks. He helped set up the call center in the Philippines. I mean, this was not a silent partner counsel. The evidence, the undisputed testimony from witnesses was that he was a silent partner. Not one person said... Evidence refutes the testimony of the witnesses. If it were simply Mr. Hoskins testifying to say, yeah, I was a silent partner, then we'd have the publishing clearinghouse case where Ms. Martin said a self-serving declaration, which the Court really liked that phrase here, said, here's a conclusion. I wasn't involved. I was a silent partner. Well, it is pretty conclusory, is it not? Not his declaration. It is every witness in this case talked about... Well, not his declaration, and that's what the district court was focusing upon, that it was a self-serving, conclusory declaration. And I read it, and I think that's a fair characterization. A declaration by a party to a case is, I would suspect every time it would be self-serving, but... But conclusory versus, and here are the facts as to why I was not, are two different things. The facts that were laid out were provided by numerous other witnesses. In our opening brief, in the testimony of the judge as well, Mr. Kirschbaum, the president of the company, said he was not there. He did not make decisions. He would stop by maybe once a month for 15 minutes. Well, he attended 80 percent of the management meetings. That was a disputed fact. Mr. Woodward, who did not start at the company until mid-2010, said it was his recollection that he attended 80 percent, and that was six or seven meetings. So what did he do for the millions of dollars that this company paid him? He received a total of, the Oxford Financial received a total of approximately $1.5 million over four years. What did he do to earn all that money? He was essentially a silent partner. He came in 2003. Was this a return on his investment? Effectively. He was there. He would provide, as was testified to by all the other defendants, he would provide high-level general advice. For example, about... He provided leads to the telemarketers, did he not? In 2003, four years before the effective time of this complaint. Well, the question is the extent of his involvement in the company, right? Right. Not just what he was doing on this particular day. Well, no. In a way, and that's really what the FTC would like the court to say. Well, there's a lot of evidence here that says that, counsel. A party that is involved in a corporation simply being involved in corporate affairs. And that's what the FTC is asking for, to say... Counsel, a silent partner is somebody who puts up a sum of money, like buying stock in the company, and then just sits back and waits for the checks to come in. And that's not what the evidence in this record shows. This guy was not a silent partner. The evidence in the record from testimony from the FTC's own witness, Robert Payne, who was the star witness for the FTC, the guy, the whistleblower, who said, hey, here are the problems of the company, said Ben Hoskins is a silent partner. He didn't know what he did. He may say that, but in law, that's not what the evidence shows that he was. And the evidence, at most, would show that Ben Hoskins would have received information about the company, but not knowledge in and of itself is the next step. Before we get to that point, we first need to show active participation. So is he in a position that he never read any of the e-mails that were sent to him? Which of the e-mails were at issue? You said he wasn't involved at all, but, I mean, there are a lot of e-mails that were sent to him, including scripts, e-mails talking about what are we going to do if the credit card companies essentially cut us off. And let me address the point of the credit card company, because the FTC tries to say, well, look. So he read that e-mail. Let me say there were chargeback issues relating to only beginning in 2010. The company acquired a company out of Ohio, it's Global Finance, that was run by Abraham Wong, who was not a part of this case, Mr. Fisher, Mr. Bierman. That company, all it did was sold $47 informational packages and then would provide leads of interested customers to ID Capital. That was the company that had the chargeback issues on those $47 packages. But doesn't the chargeback problem arise when too many people contact their credit card company and ask to reverse the charges because they feel that they have been unfairly charged? The problem would arise, right, the 1% threshold that was talked about here. And that problem, though, only related to Global Finance, which was in Ohio starting in 2010. There was never a chargeback issue. So didn't Mr. Hoskins say, well, one way we can solve this problem is we can switch credit card companies? There was discussion. Mr. Hoskins did not talk about that. There was some discussion about the credit card chargebacks. Didn't he come up with that as a suggestion? I thought I read that in the record. It's referred to in one of the e-mails. There was a discussion that he had about what the different credit card companies do as far as what their thresholds are. He said in his experience. I thought it was he's got a solution to how we can address this problem. I don't know if there's a solution. There was a discussion about that. But, again, that was limited. It was not ID Capital. That was this outfit in Ohio that involved the officers of those companies. That company, not even party to this case. It must have had an impact on this entity because the management of this entity was pretty concerned about the problem, were they not? They expressed concern they wanted to fix that problem. And they switched credit card companies in order to avoid the problem. On, again, the $47 packages. For example, there was no consideration made of. Part of the problem I have here is we've got all these entities. And as far as I can tell, they're shell companies. Nobody's quite sure what they do. But money flows and, you know, people get paid. Mrs. Hoskins pays all of her personal expenses out of the entity. I mean, it's pretty bizarre. Well, there are entities that receive the money. Global Oxford Financial. Well, I know there are entities receiving the money. The question is what do they do to earn it? And that's the big mystery here. Oxford Financial, which is the company that Leanne Hoskins was brought in from as a relief defendant. Oxford Financial preexisted ID Capital by four years. Mr. Hoskins set that up a long time ago to receive money that he received. Consulting services were provided through that entity to various other companies. You pointed out numerous other companies that paid Oxford Financial for services that Ben Hoskins provided through that company. The district court found that Oxford Financial, that the Hoskins were essentially the alter egos of Oxford Financial. And the district court looked at the amount of money that was paid to it, which was about a million and a half. Why shouldn't we just vacate this and send it back to the district court so that it can enter a $1.5 million judgment against Mrs. Hoskins since she's the alter ego of Oxford Financial? Well, first of all, the alter ego, that finding was improper. It was never pleaded in the complaint. The first time that came up was by summary judgment, and as this court has found previously, maybe in the Dugan case. I didn't see any reference in any of the briefs to Oxford Financial at all. There are numerous references as far as Ms. Hoskins' receipt of money from Oxford Financial. Well, there's no question she received the money, but beyond that the briefs don't talk about what Oxford Financial does. Absolutely, they do. Other than it's a conduit for money to be paid into it, and then it goes to the Hoskins. Mr. Hoskins provided services again, consulting services essentially, to numerous companies. That was his business. This was not his full-time occupation to provide services to Ivy Capital. So Oxford was set up, preexisted, 1999 it was set up, provided services. We listed those companies, Maya Gold, several other entities that were listed there, received money from those from 1999 on. In fact, in 2003, before Ivy ever came into being, Oxford had over $400,000 in its account. So it was not set up, as the court stated, simply to receive money from Ivy or to funnel it into them. What do we do with the evidence from the FTC investigator who ran all of the searches on the web addresses and on the telephone numbers, and they all keep coming back to the same place in Las Vegas? I'm not sure exactly what the point of that, whether that relates to, again, Mr. Hoskins has no bearing on his individual liability. It relates to the fact that we have all these shell corporations, but it's actually only one enterprise, as the district court labeled it. I mean, it looks to me like sort of a classic RICO enterprise. I'm actually surprised we're not here on criminal charge. The case, this company was set up in 2003, ran through 2011. Most companies of those sorts, if they're running some sort of a setup to be somehow difficult to see through, it would not last that long. This company was providing actual business coaching services. And the FTC did not have a complaint about those actual services. Mr. Hawks, who testified, was the only customer, actually, that the FTC, in its motion, pointed to as a great example of a deceived customer. And the court, in its brief, said he was particularly illustrative. Mr. Hawks testified he received all of his coaching sessions. He received his online access. He received access to his credit line. He received everything that he paid for. There was one thing he said he didn't receive. He didn't say what it was. And then he said, I work full time. Was he making $10,000 a month from all of the coaching that he got? One, he was never promised that. He testified that they said you could reach your goals if you work hard. Was that because he didn't pay more to get more advanced coaching services? I don't know exactly the reasons why. He picked his business of selling dorm room furniture poker tables to college students. He said he made a sale, and he also was working full time. He lied. He admitted that he lied about that. But so did the telemarketers. I mean, the telemarketers made representations about, oh, we've got all these people in there. You can make $3,000, $4,000, $5,000, $10,000 a month, you know, for just a few hours of work in your home, but there weren't anybody that they could point to that actually did that, were there? And the question then is, was Mr. Hoskins in control of or participate in those practices? And the evidence was undeniable that they did not, and that's why the FTC falls back on this new standard. from the consumer. And that's not the question here is Mr. Hoskins alone and his individual liability. Why did he think that there was such a big problem with the credit card charges if people were not dissatisfied with the services? And I think I explained about that, that that was limited to starting in 2010, one entity in Ohio was a de minimis portion of any of this related to $47 packages. Four hundred and thirty consumer complaints to the FTC alone? A hundred and some odd to the Nevada Attorney General? I mean, Mr. Hoskins had no idea that there was a problem there? You know, respectfully, that is not the first question. The question is, and this is like the JK Publishing case is very instructive because the court relied upon that heavily. There you had a president who was found responsible, and you had Maurice O'Bannon, an officer of the company, sign contracts for the company. But he signed contracts for the company. He signed one document that was a term sheet. It was not a contract. That's the only thing that they can find to come up with without a position for the company. You acknowledge he signed checks for the company. He did not sign any checks. There was no evidence of this. Theoretically, he could. But every corporate officer under the standard that's being ---- It's not the only testimony that he signed some checks. Well, there may be a dispute about that. There may be another testimony that he could sign checks. He was listed on bank accounts. But under the standard the FTC is proposing, every corporate officer becomes instantly liable when the company may have violated the FTCA. The question under the totality of the circumstances is whether or not the evidence showed that he was involved in the management of the company, is it not? Not in the management of the company. Involved or had authority to control the practices in question. If you had the CFO ---- So why isn't it relevant that his name is listed on all the company's bank accounts? It's interesting because Ivy Capital, the primary defendant, he was not an officer of that company. He was only an officer of Dream Financial, which provided payment processing to multiple companies, including Ivy, and was not involved with the primary defendants, any of the upsell defendants. He was not an officer of any of those entities. Weren't those Ivy entities common enterprises, though? Wasn't it a common enterprise with all those entities working together? The Court found there to be a common enterprise, which only relates to corporate liability as to acts of another. It does not then suddenly impute individual liability. The individual still must have participated in or controlled the acts in question. And there was no evidence of that. And the FTC essentially acknowledges that if he were a silent partner, as every witness has said, including the three other defendants who stood to lose the most from their testimony, then, yeah, he wouldn't be liable. But I have rebuttable evidence. That's the quintessential disputed question of material fact that should have been held at trial. And the trial court said at first, I've got 6,000 pages of document. There must be a dispute here somewhere. And then changed his mind later on and said, this mountain of evidence contradicts what Mr. Hoskin said. Therefore, there is no tribal question of fact. He erred on that count. The Court should reverse. And I know I've gone past my time, but I would like to ask for some time on rebuttal if permitted. Thank you. We'll hear from the government. Thank you. May it please the Court, Leslie Melman for the Federal Trade Commission. I would like to start by debunking the idea that global was something separate and apart from Ivy Capital. This was a common enterprise, and appellants have not challenged whether or not the 22 companies constituted a common enterprise. So we start by taking that as a given. Mr. Hoskins was very instrumental from the very beginning in joining with his young partners in getting this enterprise started and building it out to include all 22 entities. He had an ownership interest in many of them and was an officer or managing member of some of them. But the evidence is clear that his partners viewed his role as very instrumental. At the beginning, they referred, I believe it was Mr. Lyman said they came to Las Vegas to work with him because they viewed him as being a, and he used the term, joint decision maker. And that's how he functioned throughout the existence of this enterprise until the FTC intervened. Global was not a company out in Ohio. Global bought the assets of a company in Ohio and brought it under the Ivy Capital umbrella. And that is even reflected in the application, which has Mr. Hoskins' name on it, for merchant credit card processing for Global, in which he refers to Global as being under the Ivy Capital umbrella. So the importance, and I just want to make sure the Court understands the importance of the lead generation. He did assume, Mr. Hoskins did assume primary responsibility for lead generation. And in fact, on the company directory, he was shown as being owner, department lead generation. And this is really stage one of this entire fraud. It started off by really leading lambs to the slaughter by sending out these very enticing e-mails that advertised the existence of work-at-home jobs, where people who had to work at home due to illness, retirement, childcare reasons, could either supplement their income or prepare for retirement with these very easy work-at-home opportunities. This was really just a way to collect consumers' personal information. And I would refer the Court to the, there are about 10, 11 declarations of consumers, as well as the two undercover calls from FTC investigator Novick. And what is striking is the consistency of the approach. As soon as the consumers and the investigator reach out and respond to one of these enticing e-mail blasts, they then start to receive calls that advertise the availability of a better, a more exclusive plan. And it's very, the telemarketer is very cleverly solicit from consumers how much credit is available, is available to them on their credit cards, and then pick the price of the package according to that. So the, so we really can't distance what Global was doing from the rest of, from the rest of the IV capital enterprise. And that's why Mr. Hoskins was rightfully concerned when there were chargebacks, and they were at risk of losing their merchant credit card processing. And he did become involved and coached them on ways to avoid it. He did notice that their legal fees were high due to consumer complaints. So there were a myriad of red flags. Yet when asked during his deposition testimony, well, what, why didn't you do something about this, he just dismissed it all as being the type of returns that, that we get around Christmas and the post-holiday period. That is, that is exactly what reckless disregard is. So he was involved throughout. He did meet with the Utah Attorney General. He signed, he was responsible for an American Express card account that was available to his partners to use. And he also signed the merchant credit card agreements. You know, that's the lifeblood of an organization like this. So he's he's. Ms. Hoskins, yes. Ms. Hoskins. She was not involved. We have no evidence that she was involved in the scam. However, she did receive the proceeds of, of the scam. And, and the. She got some proceeds. She got some proceeds, some proceeds washed through to her account. And then she also used the Oxford account to pay certain costs directly. This was for Ivy Capital? Pardon me? She got, she got the money through? The money came, all, all of, all of her husband's proceeds from the Ivy Capital Enterprise were deposited into, into the Oxford account. And from that account, she wrote some checks to pay for family expenses. And we don't question the value to the family of those expenses. They benefited from them. And, and then approximately 1.1 million was simply washed through to her, her own personal account. So there was nothing that she did. She basically was managing a checkbook. Oxford had no. So this is unlike the other cases that counsel has cited where there was somebody who was providing arm's-length services to the relief defendant, and, and therefore those cases are completely distinguishable. There's a 1.5 million judgment against Oxford as well? There is. There is. Isn't that, isn't the 1.1 to, to Mrs. Hoskins part of that 1.5? It is, Your Honor. If you add them up, they add up to 2.6, right? There is, there is some, there is some double counting there. However, I would note that appellants have not raised that on appeal, and it's therefore waived. So the, what, what the, what the commission is entitled to is, it's really the 1, 1.1 million dollars. That's not entitled to the 1.1 million dollars and the 1.5 million, plus 1.5 million from Oxford, is it? That's correct. That's correct. It's, it's, it's, there was, there is some double counting there in that the, the judgment, there is an error, the judgment. There's over a million dollars of double counting, right? Right. The, the judgment really should have been entered as joint and several, joint and several liability as between Oxford and, and Mrs. Hoskins. So should we remand it to the district court for that purpose, to, to enter a joint and several judgment against both of the Hoskins for 1.5 million? Doesn't that solve the double counting problem? Well, that would solve the double counting problem. However, I would point out that, that appellants haven't, haven't raised that, that issue. But there, there, there is a double counting problem there. Unless the Court has additional questions, I would ask that the judgment of the district court be affirmed. Thank you. We'll give you a minute for rebuttal. Thank you. Does the Court perceive Ms. Hoskins did receive money that was never accounted for, the Court did not ever account for money Global received? The other big problem here, the one that's staring us in the face, is Mr. Hoskins was held liable for $130 million. We had raised, this is manifestly unjust, the, the, in the Stefanczyk case and other cases, every other case where an individual is directly and personally responsible, they are the moving force behind the activity. Mr. Stefanczyk was the picture on the book. The signed off was the spokesperson, was everything else, and controlled indisputably the sole owner of the corporation. In that type of a case, an award of the full amount may be proper against an individual. But here, it's completely manifestly unjust in that Mr. Hoskins at most received through Oxford financialists $1.5 million to award over 100 times or nearly 100 times that amount when the evidence demonstrated that he was, again, a silent partner and at least subject to dispute. If we disagree with that and we conclude that the evidence instead shows conclusively that he was not a silent partner, would it still be improper to hold him liable for the full $130 million because he was the only defendant who didn't settle with the FTC? Yes. I guess he and his wife. Well, the standard, the basis to provide that type of relief is under the equitable disgorgement essentially. Mr. Hoskins did not receive $130 million. He will not be able to pay that back. Restitution, isn't it? The consumers lost $130 million and that's why the Court picked that number as the restitution award. Restitution. And that's the point that we had raised. The Great West case in the Supreme Court has laid out the distinction between equitable restitution or legal restitution or disgorgement. I know that's a subject to other cases that are pending that have not been decided before this Court as well. That equitable relief, there's nothing equitable about it here where a party never received. Well, the equitable nature of it is restoring the consumer to the position they would have been in had they not been duped to part with the money. And that's a factual question here. For example, Mr. Hawks, who received everything he paid for but felt like I just wasn't as successful as I had hoped, he wasn't duped into, hey, I bought something and I never got the coaching sessions. He got the coaching. The coaching in and of itself was not illegal. He just wasn't as successful. And so he says, well, I wasn't as successful as I wanted. I received what I got. What was the value that he received? I don't think you've answered my question. My question was if we were to conclude that the evidence does show as a matter of law and that there's not a contested issue of material fact that he was actively involved in the scam, there would be nothing improper in entering the full $130 million restitution order against him. I believe it would because he was not, as Mr. Stefanczyk was, the moving force, the sole owner, the person responsible for this at most. He had knowledge of it. But we certainly contested, certainly in that summary judgment, that he had control over this such that a full award like that against an admittedly less involved party by every defendant in this case, to have that full award be entered against him to restore something that these consumers really didn't lose. It's not restitution. It's punitive. And that type of award should never have been issued here, and summary judgment should not have been granted. And we ask this Court to send this case back so that a trial on the merits can be had. Any other questions? Thank you. Thank you. Thank you. Case just argued. We'll stand submitted. We're adjourned.
judges: Rayes, Kozinski, Tallman